OF

# PENNSYLVANIA.

## Southern District. September Term, 1812.

1812.

Chambersburg,
Monday,
October 5.

ALEXANDER and others *against* JAMESON and others.

IN ERROR.

A jury may take out with them any writings that have been given in evidence, without distinction as to sealed or unsealed, except the depositions of witnesses.

UPON a writ of error to the Common Pleas of *Franklin* county, the case was thus:

An issue was directed between the plaintiffs and defendants in error, by the Orphan's Court of that county, to try who were the heirs of one *John Alexander* deceased. Upon the trial, the defendants gave in evidence a manuscript book found in the trunk of *Alexander*, after his death; and their counsel proposed, when the jury were about to retire, that they should take this book out with them. To this the plaintiffs objected, but the Court overruled the objection, permitted the jury to take out the book, and sealed a bill of exceptions.

*J. Riddle* and *Watts* for the plaintiffs in error. No papers can go out with the jury without consent of parties, unless they are sealed; and if they are permitted to go by the Court *against* the consent of either party, it is error. The *English* authorities are full to this point. " If the jury carry " with them any writing *unsealed*, which was given in evi- " dence in the court, it shall not avoid the verdict, although " *they ought not* to have carried it with them." 21 *Vin.* 449., *pl.* 7., *Co. Litt.* 227. 6. " Writings or books which are not

"under seal, cannot be delivered to the jurors, without the "assent of both parties." 21 *Vin.* 372. *pl.* 10. " Any paper "under seal, or not under seal, may be given in evidence; "but nothing may be *delivered* in evidence to a jury, but "that which is of record, or under seal, but by consent." *Olivi* v. *Gwin* (a). " No *copies of books* shall be delivered "to the jury, but with the consent of both parties." 21 *Vin.* 372. *pl.* 7. " The jury cannot carry any evidence from the "bar without consent of both sides, except writings under "hand and seal." *Lord l'etre* v. *Heneage* (b). To the same point are 1 *Trials per Pais.* 257., 21 *Vin.* 448. *pl.* 6., 2 *H. H. P. C.* 306., 307. The current of authorities in *England* is unbroken; and as *stare decisis* is the duty of our courts, and nothing can be more dangerous than too nicely to criticise the reason of decisions, and where the law is well settled, to reject any thing because it has not the sanction of modern approbation, it is sufficient to cite the adjucations without comment. Nothing to the contrary of the *English* rule has been decided in *Pennsylvania.* The question stands here as a question relating to the common law of jury trials, which we have taken in *extenso* from the *English* code.

*Crawford* and *Duncan* for the defendants in error. Whatever may be the law at this day in *England*, it certainly has undergone a change in *Pennsylvania.* The complexity of many commercial transactions, the variety of papers which in a question of account or of insurance must occur, beyond the power of any memory to retain with accuracy, has probably produced a change at *Guildhall;* it has beyond doubt at *Nisi Prius* in this state. There is an unvarying practice in opposition to the authorities cited by the plaintiffs in error. We have never borrowed that part of the common law of jury trials. It does not bind our courts. Why should it bind them? The distinction between sealed and unsealed instruments is at this day a name merely. In ancient times, *seals* distinguished individuals; and as juries, from the vicinage of the parties, though they could not write, could recollect and identify armorial bearings, sealed instruments were committed to them, and unsealed were not. *Gilb. Ev.* 14.

(a) 2 *Sid.* 145.              (b) 12 *Mod.* 520.

1812.

ALEXANDER
et al.
v.
JAMESON
et al.

Not a vestige of this reason is left any where; but in *Pennsylvania* such a reason never existed. Seals of wax, the only kind of seal to which such a reason could apply, have never been essential here. An ink seal, or flourish of the pen, is as good as any. *M'Dill's Lessee* v. *M'Dill* (*a*). There can therefore have been no motive for introducing a rule inapplicable to any state of things in this province: and certainly, if it ever was introduced, there is none for retaining it after the reason has ceased. To set such a rule aside, is not attended with the danger of a rash overthrow of rules affecting property. It is a rule of mere practice, perfectly arbitrary, highly inconvenient, if. not impracticable, in modern times. Even by the authorities cited, though unsealed instruments are given to the jury, and against the consent of parties, the verdict will stand; which shews that the rule is of no use. *Bull. N. P.* 308. *Vickary* v. *Farthing* (*b*). What in fact constitutes a seal? What statute defines it? What practice has fixed it? None. Whether made with wax, or as is supposed in *Jones* v. *Logwood* (*c*) to have been the original mode, with the eye tooth, is equally immaterial. Such a circumstance cannot have the least weight upon the question, whether a jury shall or shall not have a certain paper out with them. Depositions are alone excepted, because it is not fair that the written testimony of one party shall go out, when the oral testimony of the other cannot.

TILGHMAN C. J. This was an issue directed by the Orphan's Court of *Franklin* county, to try who were the heirs of a certain *John Alexander* deceased. The defendants gave in evidence a manuscript book found in the trunk of the said *Alexander* after his death. When the jury were about to retire, the counsel for the plaintiffs objected to their being permitted to carry this book out with them; but the court were of opinion that the jury should have it, to which opinion an exception was taken, on which we are now to decide. It is no longer a question whether the book was legal evidence, but the naked point is, whether, having been given in evidence, the Court might permit the jury to take it out with them. It

(*a*) 1 *Dall.* 63.        (*b*) *Cro. Eliz.* 411.        (*c*) 1 *Wash.* 42.

is undoubtedly laid down as a principle in some of the *English* cases, that the jury are to take no papers not under seal, without the consent of both parties; yet the same cases say, that if the Court permit them to be taken, it shall be no cause for setting aside the verdict. We are somewhat in the dark as to the reason of this distinction between sealed and unsealed writings, but it is certain that it originated under circumstances not applicable to the present times. The best account of it is to be found in the writings of Lord *Hale* and and Lord *Gilbert.* They say that in ancient times, men of rank and property had seals by which their families were distinguished. Those were not numerous; and as causes were tried by men in the neighbourhood, it was supposed that the seals were so notorious as to be well known to the jury. Papers under seal therefore, carried their own evidence along with them; and indeed it is probable that in many instances it was thought sufficient to affix a seal without any subscribing witness, so that the instrument was authenticated by the seal alone. But the notoriety of seals has long ceased. Every man now takes what seal he pleases. They are no longer a family distinction, and so far has it been carried in this and some other states, that a flourish with the pen in the place of a seal has been held equivalent to a seal. It is to be observed, that although the rule is laid down as I have mentioned in the *English* books, yet it does not appear that the point has been brought before any court for the last half century, during which period the commerce of the world has been prodigiously enlarged, and commercial people make very little use of seals in their transactions. I have never known this question expressly decided in *Pennsylvania;* but I take it, that in practice, the *English* rule has not been extended here. It has been our custom to deliver to the jury all written papers except depositions taken under rule of court. These have been withheld, because it has been thought unequal, that while the jury were not permitted to call the witnesses before them who had been examined in court, they should take with them the depositions of other witnesses not examined in court. After the uniform practice which has prevailed in this state, I cannot consent to the establishment of a rule which in many cases would produce confusion and injustice. I have

1812.

ALEXANDER
et al.
*v.*
JAMESON
et al.

witnessed the trial of many causes, particularly of the mer-
cantile kind, in which the jury could not decide without the
aid of unsealed papers; causes which required the minute
and laborious investigation of a variety of books and papers,
in which long calculations were necessary, founded on ac-
counts and entries. To tell the jury that they must form
their verdict on the recollection of what had passed at the
bar, would be imposing on them a most unreasonable duty.
Under such circumstances, they could do no more than
make a vague guess at the truth, and their verdict might be
an *abuse*, instead of a *satisfactory administration* of *justice*.
I am of opinion therefore that the Court of Common Pleas
had a right to permit the jury to take out with them the book
which had been given in evidence, and that the judgment
should be affirmed.

YEATES J. I would not agree to remove an unbroken
pillar of the common law, which might serve in any degree
to support the general system, or to change the grounds
upon which property has rested permanently for ages,
merely because we cannot at this day discern the correct-
ness of its principles. But I profess no veneration for the
rubbish of antiquity, resting on foundations inapplicable to
the present state of society.

The cases cited during the argument, shew that unsealed
writings given in evidence in the course of a trial, cannot
regularly be taken out by the jury, unless by consent; but
that this will not avoid the verdict. The ancient law paid
great respect to seals, as it is said by Lord Chief Baron *Gil-
bert*, that jurors might ascertain thereby on their own view,
whether the instruments were genuine or not. In modern
times, impressions on wax cease to give us any useful infor-
mation, and of the few persons who have their family arms
on their seals, fewer still are tenacious of affixing those seals
to their bonds or conveyances. But seals on wax or wafers,
which no longer distinguish the parties who have used them,
have given way in many instances in the country to circles
of ink, which have been adopted as substitutes. In this state
of things there can be no utility in preserving the old dis-
tinction, that sealed instruments may to be taken out by the
jury, to be inspected in their chamber, but not unsealed

ones. Whether a paper proved to be genuine and shewn in evidence to the jury has a seal or not, the facts imparted by its contents must produce the same effects on considerate minds. The reason for the distinction has long ceased, and with it the law has also changed.

Hence it is, that the practice for many years has been in *Pennsylvania*, that all papers which have been read to the jury, have been delivered to them on their retiring from the bar, and such has been the direction of the court when they have been appealed to. The single exception is the case of depositions; which rests on the ground, that it would not be fair and equal, that the oaths of witnesses reduced to writing on one side, should be permitted to go out, and witnesses examined *viva voce* on the other side, should be prohibited from accompanying the jury. I frankly own, that I know of no instance in the course of my experience, wherein the court have directed unsealed papers to go out, where the adverse party has absolutely opposed it; and this is the first instance which I can recollect of such opposition, after the sentiments of the court have been declared. But I am abundantly satisfied, that the court possess this inherent power for the purposes of justice, whether the adverse counsel assent or refuse their assent thereto. Can it be competent to one of the litigant parties to withdraw from the jurors the only means of settling the matters in dispute fairly? How can complicated accounts between merchants be adjusted? How is a question of loss on a policy of insurance, or those arising on the many commercial transactions which occupy our attention, to be justly terminated, unless the jurors in their chambers are permitted to have inspection of original entries, invoices, bills of lading, letters of correspondence, receipts, &c.? Upon full consideration thereof, a *true* verdict must necessarily depend, and by denying a jury the means of information, they are prevented from doing equal justice between the parties. The court therefore must possess the lawful power of ordering that the papers admitted in evidence may be delivered to the jury, whether the counsel assent thereto or not: and I have no difficulty in saying that the judgment of the Court of Common Pleas in this case should be affirmed.

1812.

ALEXANDER
et al.
*v.*
JAMESON
et al.

BRACKENRIDGE J. All law is founded on reason, natural, moral, or political. The exchange or barter of a cow or a sheep, was the early mode of commerce. The image of a cow, or a sheep, or other animal stampt upon leather by wood, or metal, represented the exchange, and hence the *Latin* term *pecunia*, from *pecus*.

Gold or silver, or other scarce metal weighed, was early a medium of commerce. Pieces stampt and purporting to be of a certain value, came in place of the actual weighing, in a particular community. This was one use of stamps. Contracts to do or perform, from the nature of things, must have early taken place. The transmission of property by conveyance or devise must also have taken place at an early period. The attestation of these could not but be by being stampt, where chirography was not known, or the individual could not write. This was the origin of *seals*, every individual being supposed to have his own seal, or where he had not, he had his teeth; and hence perhaps the phrase, I will prove it to your teeth, or by your teeth I will prove it. For it has been said, that the impression of the teeth, was in rude ages equivalent to the stamping by a seal. I have not had leisure to consult the authority which has been adduced, (*Washington's Reports*) that the cutting of the eye tooth had an allusion to this, whether the eye tooth being cut at a certain age, it might denote the being of the age of discretion, or whether it related to the impression of that tooth as a mark, being a tooth of signal impression. On abstract principle, the only reason that I could give why a seal should give a greater *credence* to writings, is that the calling for wax to make an impression on, and the application of a seal, may be an evidence of greater deliberation, and give a greater solemnity to the instrument. But the reason given by *Gilbert* why it should go out with the jury, is doubtless the true one; viz. that a jury of the vicinage might be supposed to know the seals of those using them.

> *Illi robur et æs triplex.*
> *He was a bold fellow,*

who first in these colonies, and particularly in *Pennsylvania*, in " time whereof the memory of man runneth not to

the contrary," substituted the appearance of a *seal*, by the circumflex of a pen, which has been sanctioned by usage and the adjudication of the courts, as equipollent with a stamp containing some *effigies*, or inscription on stone or metal. It would seem but a small advance to dispense with it altogether. *Il n'y a que le premier pas qui coute.* The first deviation was all. How could a jury distinguish the hieroglyphic or circumflex of a pen by one man, from another? In fact the circumflex is usually made by the scrivener drawing the instrument, and the word seal inscribed within it. The reason for the law has ceased, and why should it continue to be the law. The science of the law is improved in proportion as it is brought nearer common sense and the understanding of mankind. We have seen the struggle of the legislature to get quit of fictions and technical subtleties, and why should not courts reform in *practice* what they may reform? Why should it be left to a dwarf, according to the expression of *Junius*, to do the work of a giant? I speak of what the courts may do, compared with what is practicable by the legislature, in respect of reforming rules of construction, rules of evidence, and usages of practice. There is an extent to which the courts cannot go, which is to abolish the *technical* distinction in the use of seals altogether, because acts of assembly recognise them; such as the distinction between notes not under seal, and bonds with the annexing of seals. This, as regarding the statute of limitations, or other presumption of the effect of seals. Seals might be of use, where there were seals distinguishing identity. Coats of arms came in with the *Normans*, taken from the engraving on the shields; and these cut on stone or metal, or other material, might be of notoriety, and distinguish persons. But this has ceased to be a use of them, with the greater mass of the people, even in the countries of chivalry; and here in these states, never could be said to have had much existence. Few of the emigrants could boast an ancestry. There is no magic in words, said a learned judge, meaning *mere terms;* much less I would say can there be magic in seals. To talk of seals ascertaining any thing now, or assisting to ascertain, cannot be comprehended, unless it could be thought that there was some *charm* in them, some spell *to work evidence.* It is as unmeaning as to any effect of this nature, as the word

*Abracadabra* put at the end of a signature. Why should writings go to a jury at an early period, when they could not read? It saved the neck of a felon to be able to read a verse. They could examine a seal as to its form, or what was cut upon it, so far as respected images of substantial things; but the arbitrary marks of letters were unknown to them. The excluding unsealed instruments or papers might be said to be founded in one reason, according to the technical notions of the times. Every writing not under seal, came under the denomination of parol. And because oral testimony could not go but in the mind, this other parol could not go by the hand. But there is a use in letting all go by the hand that can be carried; for it will assist the recollection, and refresh the memory. Startled by some doubt on this subject, I have heard of a judge, a president of the Common Pleas, ruling that a letter might go, because in fact *it had been under seal.* But I believe we should smile, or wring the face with a grimace irresistible, to talk of *letters* going under this subtlety. And yet, in mercantile causes especially, there would be no possibility of a fair examination without letting them go, whether the counsel objected or otherwise. In land trials, what is to be done with field notes, drafts, and scrapings of office, unless by a fiction, we could suppose them as drawing with them the seal above in the office to which they belong. But there was a time, when there was no seal in the office; and this auxiliary would not suffice. How could juries judge of original books of entries, of accounts or calculations, and set off, without having them with them? Every case of this kind would have to go to auditors or referees. An agreement not under seal, could not go, though it contained many stipulations. We do not sit here, said a learned judge, to take our rules from *Siderfin* and *Keble*, nor do *we* sit here to be bound by every rule of a former period. We are not *cerfs adscript* to the clods of decisions. If we thought ourselves bound by every rule of the common law, it would furnish the best reason for abolishing it. The reason of the law, says Lord *Coke*, is the life of the law. And will not the reason cease with a change of situation and circumstances? In an enchanted island we might not find ourselves at liberty. But however judges might be bound by every rule of jurisprudence in the island of *Great*

*Britain*, we have crossed the ocean, and are at the distance of three thousand miles. Our situation is changed, and it is only such parts of the common law as have been introduced by usage, that we are to regard. And not all that; for we have the right to change a usage, so far as respects our rules of practice. Will common sense and sound policy exclude writings from the jury that are not under seal, and carry the distinctions of rude times into our jurisprudence? Though *Holt* and *Hale* and *Coke* may have been entramelled by them, we ought not to be. It would be like taking the skin of a dead horse for a horse. I can have no doubt but that in this case the books ought to have been carried out by the jury, and therefore I affirm the judgment.

Judgment affirmed.